UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:13-cr-00506-ERW (TCM) |
| RONALD L. ROBERTS, | ) ) ) |
| Defendant. | ) |

## THE UNITED STATES' SENTENCING MEMORANDUM

The United States respectfully requests that this Court impose a sentence against Defendant Ronald Roberts at the high end of the Guidelines range recommended by the Presentence Investigation Report ("PSIR"). As set forth below, such a sentence is supported in this case by several considerations, including the egregious nature of Roberts's conduct, the number of individuals harmed, its similarity to conduct for which Roberts has previously been convicted, the lengthy period over which Roberts's criminal conduct continued, and Roberts's continued unwillingness to admit the full scope of his criminal conduct, as evidenced by his objections to the findings of the PSIR. For these reasons and the others discussed herein, the United States respectfully suggests that a lengthy sentence of imprisonment is necessary to promote the purposes of punishment set forth in Title 18, United States Code, Section 3553(a), including most critically the protection of the public. The United States therefore requests a sentence of up to 87 months imprisonment.

I. **Overview of the Offense**

Ronald Roberts defrauded no fewer than 29 lenders of at least $2,832,743.00 on the basis of the false representation that he would repay them using the proceeds of a fictitious land deal. The best overview of this fictional transaction can be heard in Roberts's own voice, during a recorded telephone conversation that forms the basis for the first count to which Roberts has pled guilty:

> I got a deal down in Poplar Bluff, and I'm getting ready to get bought out by some people, but I've got a confidentiality, and my attorney has warned me to be very careful, you know, with that confidentiality that I got. I bought—what it is I bought a lot of my relatives out of the deal. My dad had died and two of the brothers had put quitclaims on the property, and I had to—I had to buy both of those drunk idiots out. And I had given them over a million bucks to get them out, so they soaked up all my cash, but in the meantime, I got—the quitclaim for one of the brothers was on there. They had a judgment, and they wouldn't pay the judgment off, so they left the judgment on my property and then, you know, when you—this other party, when you're delivering the, the deed to them, you've got to have a clear title. . . . So, the long story short of it is I got another buddy that—I was like 45,000 dollars short of getting this done. I got one buddy who said that he can get all but 16,000 dollars. I need 16,000 to get it done, and you tell me what would you want to do that in a short period of time, I'll make it worth your while.

This telephone conversation, which occurred on January 31, 2011, includes many common themes of the fraud, upon which Mr. Roberts improvised several new variations as his scheme continued and grew for more than three years. The details changed, but the outline was the same: there was a land deal in Poplar Bluff; Roberts stood to make a large amount of money off the deal; the closing was imminent, but he needed cash to make the deal go through; and if his victims lent, he would make it "worth [their] while." Each of Roberts's victims, lured by the chance to make a quick return, lent Roberts large amounts of money, expecting to be repaid with interest when the deal in Poplar Bluff was completed. But as Roberts now admits, there was no deal. Instead, Poplar Bluff was just that—a bluff, a lie designed to convince victims that Roberts could repay the loans he was taking, when in fact he could not.

2

Critical to the success of Roberts's scheme was the claim, alluded to in the excerpt above, that he could not disclose all of the details of the transaction because he was party to a confidentiality agreement. As Roberts explained to lenders, because of that agreement, the lenders' involvement in the transaction could not be revealed, and therefore Roberts needed their funds to be provided to him in cash. Indeed, the vast majority of the funds that Roberts obtained in the course of the scheme were received in cash. But like the land deal itself, the confidentiality agreement was a fiction, designed to deflect questions from lenders and to justify the need for cash payments, which Roberts hoped would help him, in turn, to avoid detection of the fraud.

For more than three years, Roberts repeatedly sought loans from victim after victim, telling each of them that the closing would occur within weeks or even days. But the closing never came. When victims threatened legal action or to report him to the police, Roberts threatened them with physical violence. And even after Roberts believed he had been indicted, he sought to evade punishment by inducing his former co-defendant, Dr. Kenneth Powell, to come to the United States Attorney's Office and lie for him.

As a result of these crimes, dozens of people have lost more than $2.8 million. There appears to be little prospect that any of them will see any of that money returned to them, let alone obtain the return on their investment they were promised by Roberts. Although this Court has issued a Preliminary Order of Forfeiture in the case (Doc. #75), the United States has not discovered any substantial assets that can be used to satisfy the judgment this Court will impose upon Roberts at sentencing.

## II. Application of the U.S. Sentencing Guidelines

### A. Offense Conduct

#### 1. Losses and Victims

Pursuant to the plea agreement, Roberts concedes that the base offense level for the counts of conviction is 7 and that at least 16 levels should be added on account of his having defrauded five identified individuals of at least $1,000,000. Roberts has not admitted, however, how much money he took from any one of these five victims, who, based upon the United States' evidence, were in fact defrauded of approximately $2,465,000. Roberts also denies that he fraudulently obtained any funds from an additional seven victims who directly lent money to Roberts in connection with the same fictitious land transaction admitted to by Roberts. The approximate amount lent by these individuals totals an additional $367,743. Roberts further disputes that he solicited an additional $50,000 in loans, all of which counts towards the intended loss under the Guidelines. And Roberts refuses to acknowledge that he victimized at least an additional 17 individuals who were recruited by others to contribute funds towards the fictitious land deal, based upon Roberts's false representations. When these victims and their losses are properly accounted for, Roberts's offense level should be increased an additional four levels on account of the total loss and the total number of victims of his crime.

##### a. Roberts Obtained Approximately $2,465,000 from the Five Lenders He Admits He Defrauded

Roberts admits that he fraudulently obtained loans from A.L., L.B., D.P., R.R. and M.R. exceeding $1,000,000. The evidence that the United States will present at sentencing will establish that these individuals provided loans to Roberts in the following approximate amounts:

|   | Lender Name | Amount Lent |
|---|---|---|
| 1 | A.L. | $     717,000.00 |
| 2 | D.P. | 714,500.00 |
| 3 | L.B. | 700,000.00 |
| 4 | R.R. | 198,000.00 |
| 5 | M.R. | 135,500.00 |
|   | **Total Lenders 1–5** | **$2,465,000.00** |

The United States anticipates that Roberts will dispute the amounts lent to these individuals. Admittedly, the United States does not have records showing the deposit of all of these funds directly into Roberts's accounts, but that is because, throughout the scheme, Roberts demanded cash. Roberts preferred cash because it would enable him to conceal his receipt of funds from authorities, who might otherwise have detected his crime, or at the very least have sought to collect on Robert's still-outstanding $13 million restitution obligation from his prior case. Despite the challenge of proof presented by Roberts's chosen means of executing his scheme, the United States will present evidence at sentencing where possible to corroborate these lenders' claims as to the amounts they lent, including, most notably, information based upon records of cash withdrawals from those lenders' bank accounts that frequently coincide in time with Roberts's use of similar amounts of cash at the River City Casino.

> b. **Roberts Directly Obtained Approximately $367,743 from an Additional Seven Victims Based Upon the Poplar Bluff Lie**

The United States will also present evidence that Roberts directly obtained loans from at least seven other individuals in the total amount of approximately $367,743. Roberts claims that none of these individuals are victims of his crime, either because they never lent him money, or, more likely, that they lent him money for some other purpose. Yet the United States will present evidence that each of these individuals, when interviewed by investigators, described similar representations by Roberts relating to the fictional Poplar Bluff transaction, despite the fact that

5

most of these lenders do not know each other, and none of them know the five lenders that Roberts admits he defrauded. As with Roberts's five admitted victims, the United States will present evidence, where possible, to corroborate the victims' claims as to how much money they lent.[1] Taken together with the five victims that Roberts admits, these victims' losses raise the total actual loss to $2,832,743, justifying the imposition of 18 total levels for loss under U.S.S.G. § 2B1.1(b)(1)(J), as reflected in the PSIR. *See* PSIR (Doc. #95) at ¶ 22.

        **c.    At Least Sixteen Other Individuals Were Induced, Either Directly or Indirectly, by Roberts's Misrepresentations to Lend Money to Another of Roberts's Victims, Who in Turn Provided Those Funds to Roberts**

Even if those seven additional lenders had not lent money to Roberts believing they would be repaid when the Poplar Bluff deal closed, that would not spare Roberts from the imposition of two additional levels under U.S.S.G. § 2B1.1(b)(2)(A). That is because three of Roberts's admitted victims themselves obtained loans from at least 17 others on the basis of Roberts's misrepresentations, which funds those victims then conveyed to Roberts. They therefore qualify as victims under the Guidelines, insofar as they "sustained any part of the actual loss" resulting from the offense, having parted with their funds on the basis of false representations that originated with Roberts. *See* U.S.S.G. § 2B1.1, Application Note 1 (definition of "victim"). Indeed, as the United States will establish at sentencing, at least nine of these "recruited" victims spoke with Roberts directly about their decision to lend. Thus, even under a conservative calculus, Roberts defrauded

---

[1] The United States anticipates that Roberts will claim that the $210,000 that N.S. lent him was lent for purposes other than Poplar Bluff, but that is beside the point. N.S. has indicated that, from the first time she lent Roberts money, she was told that he expected to receive millions from the Poplar Bluff deal, and thus she believed, regardless of the purpose for which she lent, that the Poplar Bluff deal would provide a source of repayment for her loans.

10 or more victims, resulting in a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A). *Accord* PSIR (Doc. #23) at ¶ 23.[2]

### d. Roberts Is Also Accountable for $50,000 of Intended Losses Based upon Solicited But Unrealized Loans

In addition to the $2,832,743 in actual losses suffered in this case, Roberts is also responsible under the Guidelines for $50,000 in intended but unrealized losses based upon loans that Roberts solicited but did not successfully obtain. *See* PSIR (Doc. #95) at ¶ 25. The PSIR also properly indicates the restitution amount as $2,812,443 as a result of approximately $20,300 in repayments to lenders made by Roberts. *Id.*

For these reasons, the United States respectfully suggests that the total offense level before acceptance is at least 27 before considering obstruction of justice and acceptance of responsibility.

---

[2] This conservative approach does not count as victims individuals whose money was conveyed to Roberts by an intermediary unless they were induced to lend by fraudulent representations related to the fictitious land deal alleged in the Indictment. A.L., for example, solicited loans from an additional 26 lenders, the funds from which he then provided to Roberts, but the United States has not discovered any evidence that these 26 lenders were pitched on the Poplar Bluff deal before lending; instead, it appears they lent to A.L. based upon his own credit. Likewise, two of the individuals who lent to L.B. did so without receiving representations relating to the fictitious land deal. Because these 28 individuals were not induced by any falsehood to part with their money, the United States has not sought to have them counted as victims under § 2B1.1(b)(2)(A). Should the Court determine that these individuals are nonetheless properly counted as victims, then that would increase the total number of victims to 57, resulting in a four-level enhancement under § 2B1.1(b)(2)(B). In any event, the Court should consider the harm to these "indirect" victims when it determines what sentence ultimately to impose upon Roberts. *See infra* Part III.

## 2. Obstruction of Justice

### a. The Obstruction of Justice Enhancement Is Warranted by This Court's Prior Findings Alone

Roberts's most vociferous dispute is with respect to the enhancement for obstruction of justice. This Court ordered Roberts detained pending trial on account of the fact that, among other things:

> (1) Defendant contacted a United States Postal Inspection Special Agent, and attempted to dissuade her from pursuing an ongoing investigation into potential criminal activity . . .  (2) Defendant put his hands around the neck of a witness when she asked him to repay her money loaned . . . (3) at least one witness observed Defendant occasionally practice speaking with different voices, in an apparent attempt to solidify one of his multiple aliases, "Ed Faulkenberry," . . . and (4) various verbal threats in efforts to discourage certain individuals from cooperating with the government . . . .

Mem. & Order (Doc. #45) at 2. The United States will present evidence at sentencing, as it did at the detention hearing, to support each of these findings.

### b. Roberts Also Obstructed Justice by Attempting to Induce a Witness to Provide Investigators with False Information

In addition, the United States will present evidence that, after Roberts believed that an indictment had been returned against him but before he turned himself into authorities, Roberts contacted his former co-defendant, Dr. Kenneth Powell, and attempted, in the voice of "Ed Faulkenberry," to persuade Powell to lie for Roberts in an interview scheduled with Powell at the U.S. Attorney's Office the next day. Although the phone call appeared to Powell to originate from a blocked number, phone records show that the call came from a cell phone registered to one of Roberts's companies, which cell phone was in Roberts's possession at the time of his arrest. In a recording of the phone call, which the United States will play at sentencing, Roberts ("Faulkenberry") can be heard to state:

> "Sir, they'll believe if you go down there and tell these people that he didn't have anything to do with it and it's your deal, they're gonna let the shit go 'cause they got no case then. You come in there in a trial and say that, they ain't got no case against the man, sir. Their life is in your hands, basically, and mine."

Later in that same conversation, "Faulkenberry" states, as though he is talking to a third party, "We already know that he [Powell] can get him [Roberts] out of it, but you know, the thing is, is he gonna do it?" "Faulkenberry" then tells Powell to call Richard Sindel, Mr. Roberts's then-attorney, to receive instruction as to what he should state during the proffer: "That's his client, and for him to get his client off, that's what you need to do."

In light of these flagrant attempts to forestall detection of the scheme and avoid punishment for the crimes to which he has now confessed, the United States respectfully submits that an enhancement under § 3C1.1 is appropriate. As a result, the total offense level before acceptance is 29.

### 3. Acceptance of Responsibility

Based upon the information available at the time the parties entered into the plea agreement, the parties have agreed that three levels should be deducted from the total offense level on account of Roberts's having accepted responsibility for the counts charged and timely notifying the United States of his intention to plead guilty. The United States is not presently aware of any post-plea misconduct that would cause the United States to recommend a denial of acceptance of responsibility. *See* U.S.S.G. § 3E1.1, Application Note 1(a) ("Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection.").

If, however, Roberts presents false testimony at sentencing or frivolously contests the findings of the PSIR, the United States has reserved the right to change its recommendation. *See United States v. Lee*, 625 F.3d 1030, 1035 (8th Cir. 2010) ("[W]here a defendant 'falsely denies, or frivolously contests, relevant conduct that the court determines to be true,' a district court should find that the defendant 'has acted in a manner inconsistent with acceptance of responsibility.'" (quoting U.S.S.G. § 3E1.1, Application Note 1)); *see also United States v. Daniels*, 625 F.3d 529, 535 (8th Cir. 2010) ("To receive this reduction, a defendant cannot minimize his conduct or partially accept responsibility."). In any event, Roberts's insistence on taking responsibility for only a fraction of his criminal conduct, while it may be enough to qualify him for a reduction under the Guidelines, is a factor that this Court should take into consideration when determining Roberts's ultimate sentence, as described in further detail below.

### B. Criminal History

The PSIR indicates that Roberts is in criminal history category II on account of his prior conviction in 2001 before this very Court in a conspiracy to defraud investors that is strikingly similar to the offense to which Mr. Roberts has now pled guilty. In both cases, Roberts obtained millions of dollars from investors based upon the fiction of a real estate transaction. As the United States will establish at sentencing, a witness in that prior case described how Roberts used false voices, including the voice of "Ed Faulkenberry," to lend credibility to the scheme. Roberts has repeated that ruse (and added others) in this case.

In that prior case, Roberts was charged with mail and wire fraud. The evidence in this case suggests that Roberts attempted to evade federal jurisdiction by requesting loans in cash in order to avoid receiving funds via mail or wire. Robert's intentions in this regard are implicit in his

statement to an investigator, in an unsolicited phone call where Roberts attempted to dissuade her from continuing her investigation, that "there is no law against borrowing money from people" and that he "can borrow money from whoever he wants to." Likewise, as the Court will hear at sentencing, in a recorded conversations with a person whom Roberts believed to be a prospective lender, Roberts balked initially upon learning that his intended victim lived out of state (in Chicago), continuing with his pitch only after hearing that the caller had a trip to St. Louis planned the following week.

The PSIR in the prior case indicated that, under the Guidelines, Roberts was to receive a sentence between 108 and 135 months. This Court imposed a sentence against Roberts of 115 months, which was later reduced to 97 months. The PSIR also reflects that Roberts has two other criminal convictions, but neither meets the qualifications under the Guidelines to be counted towards his criminal history. In addition, the United States notes that, while the PSIR does not indicate that Roberts began the instant offense while on supervised release, the first fraudulent loan identified by the United States was solicited by Roberts approximately two months after his supervised release terminated. Thus, as explained below, these potential understatements in his criminal history warrant a sentence at the upper end of the Guidelines range.

### III.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In considering whether to impose a Guidelines sentence and where within the applicable range to sentence a defendant, this Court is obligated to consider the factors set forth in 18 U.S.C. § 3553(a). These factors include "the nature and circumstances of the offense," "the history and characteristics of the offender," and "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense[,] to

11

afford adequate deterrence to criminal conduct[,] to protect the public from further crimes of the defendant, and to provide the defendant with . . . correctional treatment in the most effective manner." *Id.* In this case, each of these considerations weighs in favor of imposing a lengthy custodial sentence against Roberts.

 First, the nature and circumstances of the offense are egregious. Unlike some fraud cases, where a defendant may begin with good intentions and concoct a series of lies in order to cover up a failed investment, Roberts devised this scheme from the start. At no point did his representations have any reality, nor did Roberts have even a subjective belief that they would come true in the future. For more than three years, Roberts repeated the Poplar Bluff lie over and over, to lender after lender, each time telling them that the fictional closing was imminent. There is no evidence that Roberts expressed any remorse to these lenders at any point during the scheme for failing to repay their loans. Rather, he lulled the lenders with claims of delays in the closing, demands from his counterparties, and other factors that were supposedly out of his control. He used these false excuses to solicit yet further loans from those lenders. When one lender ran out of money, he found another. With scant exception, Roberts made little attempt to repay his lenders, instead spending whatever money he received nearly as soon as he got it.

 Although the Guidelines take into account much of Roberts's criminal conduct, they do not fully address either the length of Roberts's scheme or the breadth of the harm that his actions have caused. This Court should consider that Roberts's actions constitute a lengthy and repeated course of conduct over a span of more than three years, resulting in harm to at least 12 victims that Roberts defrauded directly and another 17 whose funds he obtained through an intermediary. While those 29 may be the only victims counted under the Guidelines, nearly double that number

of individuals have suffered a financial loss because of Roberts's misconduct. *See supra* p. 7, footnote 2. According to A.L., who solicited 26 of these 28 additional lenders, Roberts knew that A.L. was soliciting others in order to obtain funds for the Poplar Bluff deal, although A.L. did not communicate the particulars of the deal, which Roberts had told A.L. was strictly confidential, to most of the lenders he recruited. Roberts fully apprehended the scope of the harm he was causing in this case, and that knowledge should be reflected in this Court's ultimate sentence. *Cf. United States v. Calhoun*, 721 F.3d 596, 605 (8th Cir. 2013) (upholding district court's victim calculation where the forseeable actions of defendant's co-conspirators resulted in losses to additional victims).

Second, Roberts's history weighs heavily in favor of a lengthy custodial sentence. As explained above, Roberts pled guilty to executing a markedly similar fraud in 2000. He was incarcerated for that offense until August 2008, and on supervised release until August 2010. Not even two months after the termination of his supervised release from his prior case, Mr. Roberts solicited his first known fraudulent loan from R.R. on the basis of a new set of misrepresentations. Rather than taking his prior punishments to heart, the lesson Roberts appears to have learned from his prior case is how to avoid being caught. In this case, he attempted to avoid detection of (and federal jurisdiction over) his crimes by insisting, whenever he could, on receiving his loans in cash. He invented multiple fake personalities, most of whom called from blocked phone numbers, to lend legitimacy to his claims and allow him to deflect blame to others. He threatened witnesses who called his bluff. And finally, at a time when he thought his arrest was imminent, he solicited his former co-defendant to lie on his behalf, in another attempt to escape accountability for his conduct.

13

This history reveals a defendant who has not been rehabilitated by his prior punishments, but who instead has only become more hardened in his resolve to break the law and escape the consequences of his actions. Even today, Roberts refuses to admit the full scope of his criminal conduct, attempting to minimize the losses he has caused and the number of individuals he has harmed. As the evidence the United States will present at the hearing will demonstrate, there is no explanation for Roberts's insistence on disputing these issues but his own recalcitrance.

A lengthy custodial sentence in this case is justified by each of the factors under 18 U.S.C. § 3553(a), but none so much as "the need to protect the public from further crimes of the defendant." The United States has significant concern that, regardless of when Roberts is released from prison, he is likely to reoffend. Roberts has proven himself to be adept at obtaining large amounts of cash from lenders on the basis of little more than a handshake. Such transactions are difficult even for a watchful probation officer to detect, let alone for a criminal investigator to piece together months or years after the fact. And while the United States was ultimately successful in uncovering Roberts's crimes in this case, if his history is any indication, it seems likely that Roberts will devise yet further ways of avoiding detection for similar crimes in the future. The question for Roberts is whether he will learn the right lesson from this next period of incarceration, or if he will continue to engage in the behaviors that have brought him back to precisely where he was nearly 15 years ago. Roberts's conduct, even today, provides little reason to answer that question in his favor.

## IV. Conclusion

The United States respectfully requests a sentence at the upper end of the applicable Guidelines range.

Dated: January 15, 2015

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768
Assistant United States Attorneys
111 South 10th Street, Suite 20.333
Saint Louis, Missouri 63102
Telephone: (314) 539-2200
Facsimile: (314) 539-2287
*richard.finneran@usdoj.gov*

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2015 the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO
Assistant United States Attorney